No. 33,849

Anna M. Rasmussen, *Appellant*, v. Theodore C. Rasmussen et al.,
*Appellees.*

(84 P. 2d 919)

Opinion filed
December 10, 1938.

*Fred R. Smith, Gerald F. Smith,* both of Manhattan, *Raymond E. Smith,* of
Marysville, *Frank H. Meek,* of Clay Center, *A. Harry Crane* and *Ward D.
Martin,* both of Topeka, for the appellant.

*W. M. Beall,* of Clay Center, for the appellees.

The opinion of the court was delivered by

Wedell, J.: This action was instituted to establish title in the
plaintiff to land on the theory of a constructive trust. Plaintiff
also sought to recover certain rents and profits from the land, and to
eject the principal defendant, Theodore C. Rasmussen, her divorced
husband, therefrom. Plaintiff has appealed from a ruling sustaining
defendant's demurrer to plaintiff's evidence on the question of title
and from the general judgment in favor of defendant Rasmussen
on the issue of rents. The relationship of other defendants to cer-
tain transactions will be disclosed in the course of the opinion.

The material averments of plaintiff's petition were in substance as
follows: Plaintiff and the defendant, Theodore C. Rasmussen, were
married in 1895. Plaintiff was entirely inexperienced in business
matters. By reason of the intimate and confidential relationship,
defendant knew of plaintiff's aversion and obsession against signing
notes and mortgages. In about the year 1931 difficulties and dis-
agreements arose between them, and defendant conceived the plan of
obtaining his freedom from plaintiff, and preventing plaintiff from
receiving any property owned by the parties. Defendant planned,
connived and conspired to effect and enter into a property settle-
ment with plaintiff under a postnuptial agreement, whereby, owing

to plaintiff's aversion to signing notes and mortgages, he would obtain the property which plaintiff would receive under his contemplated postnuptial agreement. In keeping with such a scheme, defendant Rasmussen induced defendants M. M. Smith, C. C. Smith and R. O. Smith to loan to him certain sums of money in order to carry out his plan. The plan was to have plaintiff promise in the postnuptial agreement to take the particular property herein involved, to wit: The southwest quarter of section 11, township 7, of Clay county, Kansas, which land had been sold under mortgage foreclosure by the Farmers and Merchants State Bank, of Morganville, Kan., which bank then held a certificate of purchase therefor. The plan was further to have plaintiff agree to fully pay and discharge the amount of the foreclosure judgment, which, by reason of plaintiff's aversion to signing notes or mortgages, the defendant Rasmussen had reason to believe she would not do. Defendant, therefore, on or about January 8, 1932, arranged with one C. C. Smith, one of the defendants herein, to buy the certificate of purchase and to sell it to him (Rasmussen), with the result that he would acquire the title to the land in question. Pursuant to such plan and scheme, plaintiff did, at the request of the defendant, enter into such a postnuptial agreement. Among other things, that agreement provided plaintiff should receive from the defendant a quitclaim deed to the property heretofore mentioned, and that she was to have the right to redeem the same. The mortgage on this particular land had been signed by the defendant alone. On April 25, 1932, defendant filed an action for divorce against the plaintiff and therein requested the court to declare an emergency and, as grounds therefor, stated that he desired to refinance the properties he had received under the postnuptial contract. That application showed defendant knew of plaintiff's aversion to signing notes and mortgages. An emergency was declared, the divorce was granted, and the postnuptial agreement entered into on January 23, 1932, was approved by the court, with the result that plaintiff received only the property above mentioned.

That about April 6, 1934, the plaintiff failed to redeem the property which she was to receive by reason of the postnuptial agreement and decree of divorce, by reason of her business inexperience and aversion to signing notes and mortgages. On April 7, 1934, a sheriff's deed was executed and delivered to defendant, C. C. Smith. Pursuant to defendant's plan and conspiracy to defraud plaintiff,

the defendant Rasmussen obtained a warranty deed to the property on April 11, 1934. That deed purported a consideration of $2,200. On April 11, 1934, defendant Rasmussen executed and delivered to defendants M. M. Smith, C. C. Smith and R. O. Smith his note and mortgage in the sum of $2,300, covering that real estate. In this manner defendant Rasmussen completed his plan and conspiracy to obtain a divorce from plaintiff and also prevented her from receiving any of their property. That by reason of defendant's plan and conspiracy and the fraud perpetrated upon the plaintiff, defendant Rasmussen should be declared to be the trustee *ex maleficio* of the property involved, and plaintiff should have the property, subject only to the lien of the foreclosure judgment, with interest. At all times since January 23, 1932, the land was of the fair value of $6,500, with the result that defendant has unjustly and inequitably benefited himself through the plan herein described. That defendants M. M. Smith, C. C. Smith and R. O. Smith took from defendant Rasmussen the above-mentioned note and mortgage for $2,300 with knowledge of the fraudulent purpose and acts. That such mortgage should be canceled and those mortgagees should be entitled to a lien only for such sum as was actually paid upon the original foreclosure, judgment with interest, taxes and costs, which amounts plaintiff now offered to assume and agreed to pay. That on July 9, 1932, plaintiff made demand in writing upon defendant Rasmussen for the return of the property.

The second cause of action was for rents and profits. After incorporating the allegations contained in the first cause of action it alleged, in substance: Plaintiff had never recorded the quitclaim deed she received to the property. During the period of the equity of redemption, nor at any time since, had she received any income from the property except for the year 1932. Defendant had received all income since January 23, 1932, in the sum of at least $2,000 and should be required to account to plaintiff therefor.

The third cause of action was one in ejectment. It incorporated the allegations contained in the first cause of action and alleged plaintiff was the lawful owner of the property, that the defendants, Arthur Cyr and his wife, were in the possession thereof as tenants of defendant Rasmussen, and that they should be ejected therefrom and plaintiff placed in possession.

The verified answer of defendant Rasmussen was as follows:

"That the relationship of principal and agent did not exist between plaintiff and defendant Theodore C. Rasmussen regarding the possession and management of the real estate involved. That defendants admitted the marriage, the foreclosure sale and buying of the certificate of purchase by Clay C. Smith, the execution of the postnuptial contract, the suit for divorce by Theodore C. Rasmussen, the granting of an emergency, the entry of a decree of divorce, the issuance of a sheriff's deed to the land involved, and that the property was sold to Theodore C. Rasmussen all as alleged in plaintiff's petition.

"That on March 1, 1918, Anna M. Rasmussen sued Theodore C. Rasmussen for separate maintenance; that she alleged that for nearly two years she and her husband had not lived together and that because of his conduct to her she was unable to live with him as her husband without fear for her personal safety, and that her health and peace of mind required that she live separate from Theodore C. Rasmussen, a copy of said petition being attached and marked exhibit A; that from the time of such suit for separate maintenance up to the time of the divorce the Rasmussens had never lived together as husband and wife; there was no reconciliation; that they lived apart as if they were strangers, and that plaintiff's attitude toward Theodore C. Rasmussen was hostile, and that no fiduciary or confidential relation existed between said parties."

Plaintiff's reply contained a general denial and in addition thereto the following:

"Plaintiff admitted that she had brought suit for separate maintenance, but alleged that such suit was later dismissed, but that notwithstanding such suit a confidential and fiduciary relationship existed between plaintiff and Theodore C. Rasmussen and that said defendant was in no way excused of his duty to deal fairly with the plaintiff; that plaintiff was entirely inexperienced in business and at great disadvantage in business transactions and has certain peculiarities, all of which were known to Theodore C. Rasmussen as shown by paragraphs 3 and 7 of exhibit 'A,' attached to defendant's answer: Wherefore plaintiff prayed judgment as prayed for in her petition."

Upon the issues thus joined the parties proceeded to trial. They filed an agreed statement of facts. While it did not preclude the introduction of other evidence, it did contain certain admissions of fact touching the question of title which, in substance, were:

Plaintiff and the defendant, Rasmussen, were married in the year 1895. A divorce was granted on June 6, 1932, in favor of the husband (defendant herein), on the ground of the wife's (plaintiff herein) abandonment; previously and in July of 1915 the plaintiff herein was adjudged insane and committed to the state hospital. In December of 1916 she was adjudged to have been restored to her right mind and her citizenship was restored by judicial decree. By reason of friction and disagreements between them the parties con-

tinuously and uninterruptedly lived separate and apart after about 1917 until the divorce in 1932. In March of 1918 the plaintiff herein filed an action against the defendant herein ˙for separate maintenance, which was finally dismissed on the court's own motion on March 26, 1923. Although the parties were not living together, defendant Rasmussen continued to manage and control all of their property during those years, and also provided for and assisted in the maintenance and support of his wife. That in 1931 defendant Rasmussen, alone and without the signature of his wife, had executed two notes to the Farmers and Merchants State Bank of Morganville in the total sum of $4,063.17. To secure that amount he also executed a real-estate mortgage in favor of that bank. The mortgage showed a consideration of one dollar and advancements upon various tracts of real estate, including that involved in the instant case. That mortgage was subject to another mortgage in favor of Chris Pinkbiner. It was executed by *Louisa* Rasmussen alone, and covered only one-half of the property herein involved. Later in the year 1931 the defendant Rasmussen alone executed another small note to the same bank. In August of the year 1931 he alone executed a mortgage in favor of George L. Davis and W. M. Beall, as trustees, in the sum of $4,060.05, covering various lands, including that herein involved. That mortgage appears also to have been given for the purpose of securing notes to various parties. In September of 1931 the Farmers and Merchants State Bank of Morganville filed a mortgage-foreclosure action upon the land involved herein, together with other lands covered in the mortgage to that bank. In that action the mortgagee, Chris Pinkbiner, filed his answer and cross petition for the foreclosure of his mortgage. In October of 1931 Davis and Beall, trustees, filed their answer and cross petition asking for a foreclosure upon the lands here involved and other lands covered in their mortgage. Plaintiff, Anna M. Rasmussen, was not made a party to that action. The defendant, Rasmussen, did not contest that action. The land here involved was sold at sheriff's sale in December of 1931 to the Farmers and Merchants State Bank of Morganville, for $1,711.79, and a certificate of purchase therefor was issued to the bank on January 8, 1932, and was assigned to the defendant, Clay C. Smith, on the same day. On June 13, 1933, a written agreement for the purchase of the land herein involved was entered into by the defendant, Rasmussen, and Smith Brothers. In the previous year, and on January 23, 1932,

the plaintiff, Anna M. Rasmussen, and the defendant, Theodore C. Rasmussen, entered into a written postnuptial agreement. Under that agreement the property here involved was to be the separate property of this plaintiff, subject, however, to two agricultural leases on separate portions of the land for the year 1932. Under the express terms of that agreement plaintiff was to have this property, with the distinct understanding and agreement that she would promptly and without unnecessary delay, and not later than sixty days from the date of that agreement, pay off and fully discharge the amount for which the land was sold at sheriff's sale to the Farmers and Merchants State Bank of Morganville. Other lands were set aside to the defendant. In that agreement plaintiff further expressly agreed that during the continuance of the marriage relation each party would, at the request of the other, sign, execute, acknowledge and deliver any deed, mortgage or other instrument of conveyance of the other, without any cost to such other party, and with the distinct understanding that the party executing such papers should in no wise be personally liable upon any promissory note, debt or obligation secured by such mortgage. In that agreement it was expressly provided:

"7. It is further agreed that if in the future either of said parties should institute an action against the other for divorce, he or she shall do so at his or her own expense and cost, and each covenants and agrees with the other that in such event neither will claim, demand or receive any property from the other in such action, and that the settlement herein stipulated and contained is intended for, and is, a full, final and complete settlement and adjustment and division of the property matters between said parties and shall be final and conclusive upon them in any court of record."

The agreed statement of facts contained, in substance, the further provisions: On April 25, 1932, the defendant instituted an action for divorce on the ground of abandonment, and a decree of divorce was granted in his favor upon that ground on the 6th day of June, 1932. In that decree the postnuptial agreement was by the court declared to be a fair, just and equitable agreement, and that it had been understandingly entered into. That agreement was approved, ratified and confirmed by the court, and it was made a part of the decree of divorce. A period of sixty days had not elapsed between the filing of the action for a divorce and the decree, but an emergency had been declared under the provisions of G. S. 1935, 60-1517. In support of the emergency decree plaintiff had filed a verified application for the declaration of an emergency. The grounds for the application were, in substance:

The land set aside to plaintiff and defendant in the postnuptial agreement had been sold under the same sheriff's sale. The defendant was endeavoring to redeem the land reserved to him in that agreement. He had negotiated with Smith Brothers to refinance the property reserved to him. Although the issues in the divorce action had been fully joined, and although he had made all arrangements to complete the loan to refinance his properties, his wife refused to execute the papers as she had agreed to do in the postnuptial agreement. He had every reason to believe defendant would never join in the execution of the necessary papers. It was extremely doubtful whether the lenders would be willing to wait sixty days from the date of the filing of the petition for divorce, to make the loan. Unless he was able to negotiate with them for that loan, he did not know where he could possibly obtain the necessary money with which to redeem the land. Upon that showing an emergency was declared and the decree of divorce was rendered.

In addition to all of the above-admitted facts, oral testimony was offered by both sides for the purpose of throwing additional light on the question of alleged fraud, and on the question of whether there had been a breach by defendant of a fiduciary and confidential relationship of the parties, while such a relationship in fact existed, and also on the further questions of whether the defendant, during the confidential relationship of the parties, had actually acquired knowledge of plaintiff's peculiarities and aversion for signing notes or mortgages, and whether after that relationship ceased defendant used that knowledge for the purpose of depriving the plaintiff of her property. No useful purpose can be served by a review of that evidence. The action was tried by the court. It was the trier of the facts. It resolved those issues against the plaintiff and in favor of the defendant. There was an abundance of substantial evidence to support the judgment in favor of the defendant on those issues. There was no evidence plaintiff was insane. She had been restored to sanity by judicial decree in 1916. This action was not commenced until July 9, 1936. True, there was evidence she had been and still was weak, physically and mentally, and was not experienced in business dealings. She was, however, represented throughout by counsel. It is not suggested her counsel at any time were unfaithful to the trust bestowed or in any sense inefficient in representing and protecting her interests. The trial court, throughout the instant litigation, was exceedingly cautious and repeatedly in-

quired from witnesses called in her behalf and from her counsel whether, in their opinion, plaintiff was insane or unable to carry on the instant litigation. The answers without exception were to the effect it was not contended plaintiff was insane or unable to carry on the litigation. It was only contended plaintiff was mentally weak and had a peculiar aversion to signing notes or mortgages, and that defendant had learned those facts during his confidential relationship with her and had taken advantage thereof by arranging a plan and scheme whereby she would be deprived of her property by reason of her failure and refusal to sign notes and mortgages. Had the court found these contentions of the plaintiff were supported by the evidence, then we undoubtedly would be obliged to give careful consideration to the numerous authorities cited in support of her contention. Unfortunately for her, the court reached a different conclusion. While the court did not make formal findings of fact, it did summarize the issues and the evidence on the hearing of the motion for a new trial. That summary was:

"The Court: Well, of course, I feel, as I indicated at the time of the hearing, the plaintiff's right is dependent, in the first place, upon establishing some sort of trust relationship or fiduciary or other confidential relationship between her and the defendant. On the question of the fiduciary or confidential relationship, the evidence pretty strongly negatives that. The relationship was very strained, so much so that they have had no dealings, social or otherwise, with each other for twenty years or thereabouts.

"The key to plaintiff's claim was a claim of knowledge on the part of the defendant, during the existence of the marital relationship, of a peculiarity, idiosyncrasy, whatever we want to call it, on the part of the plaintiff against signing papers, notes, mortgages; and there just is no evidence to substantiate that claim. The plaintiff was permitted to offer evidence of a refusal on her part to sign something. But, as I recall it, without exception those incidents occurred after the divorce, and there was no evidence of any knowledge or information of those transactions having come to the defendant.

"Of course, another vital step seemed to be the element of collusion or agency with the Smiths. There could be no doubt from the evidence that the Smiths came into the possession of this certificate of purchase in an ordinary business transaction, in due course of their business, and without any suggestion, or even knowledge, on the part of the defendant. He had nothing to do with that. The defendant undoubtedly was aware of the fact that his wife was not exercising the right which she had under the law given to her by the contract, and made arrangements, if she did forego that right, by which he could purchase the farm. She still had the full right, and she was urged to exercise it. According to her own testimony she was threatened by some of her own relatives that if she did not go down and redeem this land they would not have anything more to do with her, they would not help her any more.

She testified that one of her brothers said that he was absolutely through with her if she passed this up.

"Now, fraud on the part of the defendant which required that much fortitude on the part of the one defrauded, to withstand the threats of all her friends and relatives and her attorneys, when all she had to do was merely do what they asked her to do, and his entire fraudulent scheme fell, seems rather far-fetched to the court.

"The contract was fairly entered into. It has now been twice before this court. Her relatives and others of her own selection were there at the time the contract was entered into, and she was represented by counsel. Is that correct, or was she? Did you act merely as scrivener for both parties? It was at your office.

"Mr. Beall: She was represented by Mr. Harlan.

"The Court: Oh, yes, that is right. She was represented by counsel, by thoroughly capable counsel. I think we could all agree on that.

"So, as I say, I am utterly unable to see anything for a court of equity to lay hold on. Of course, the result is that she lost this farm, but, to borrow a term from another field of the law, it certainly cannot be said that anything the defendant did was the 'proximate cause.' The whole thing was the result of some notion of her own, and there is no evidence that her husband had any reason to suppose that she would take such an attitude at the time the contract was entered into.

"So, the motion for new trial will be overruled."

The summary of the evidence discloses the court, in effect, made not only definite findings of fact on the controverted issues, but it also discloses at least a portion of the evidence which supports those findings. Under these circumstances there are no facts out of which this court can create a constructive trust. The judgment is affirmed.